IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

|                                      |                  |
|--------------------------------------|------------------|
| DAVID J. PORTER,                     |                  |
|   Plaintiff,                         |                  |
|   vs.                                | NO. 2:13-CV-00319 |
| CITY OF HAMMOND, CITY OF HAMMOND POLICE DEPARTMENT, OFFICER MATTHEW SIEGFRIED, and SERGEANT F. DELGADO, |  |
|   Defendants.                        |                  |

**OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment, filed on June 15, 2017. (DE #39.) For the reasons set forth below, the motion (DE #39) is **GRANTED**. The Clerk is **ORDERED** to **DISMISS** this case **WITH PREJUDICE** and to **CLOSE** this case.

BACKGROUND

Plaintiff David J. Porter ("Porter") filed a complaint against Defendants City of Hammond, City of Hammond Police Department, Officer Matthew Siegfried and Sergeant F. Delgado (together, "Defendants"), alleging that Defendants violated 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution when they illegally tased, beat, and arrested him during a traffic stop on August 15, 2015. Defendants have filed

a motion for summary judgment claiming there are no genuine issues of material fact and they are entitled to judgment as a matter of law. The instant motion is fully briefed and ripe for adjudication.

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citation omitted).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but

rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Facts

On August 15, 2011, Porter was riding as a passenger in a vehicle driven by his nephew, Josiah Porter ("Porter's nephew") in Hammond, Indiana. (Ex. 2 at 62, 69.) They were pulled over by Officer Siegfried ("Siegfried") around midnight for failing to dim high beams for oncoming traffic. (Ex. 4 at 8-10.) Porter listened to the verbal exchange between his nephew and the officer. Porter explained that his nephew was "trying to beat the ticket, so he's giving him all these excuses," in a "passionate like" manner. (Ex. 2 at 74.) Porter's nephew testified that Siegfried asked him to step out of the car, while Porter stated that Siegfried removed his nephew from the car. (Ex. 3 at 12; Ex. 2 at 87.) Siegfried began to pat Porter's nephew down at the hood of his squad car, which was parked directly behind the car in which Porter was a passenger. (Ex. 2 at 90.) As he started this, Porter stepped out of the passenger side of the car. (*Id.* at 92.) Porter repeatedly yelled, "Why are you detaining him?" (*Id.* at 92.) According to Porter, the police officer responded by yelling something

repeatedly and pointing, though Porter denies that he could make out those instructions. (*Id.* at 92, 102.) Porter's nephew testified that Officer Siegfried was telling Porter, "Get back in the car. Get back in the car." (Ex. 4 at 16.) Porter concedes that the officer was probably telling him to stop interfering. (*See id.* at 97-98.)

According to Porter, as he persisted in asking Siegfried why he was detaining his nephew, Siegfried rushed at him, grabbed his neck with both hands and choked him. (*Id.* at 104, 106; *cf.* Ex. 7 at 30 (Siegfried's testimony that Porter "charge[d] at me").) The two fell to the ground struggling in a bear hug, with no choking going on. (Ex. 2 at 111-12.) Porter was hanging onto the officer's body when they fell to the ground. (*Id.* at 114, 116.) According to Porter's nephew, it as a "mutual fall" not on top of each other; "[t]here was a tussle; they both fell." (Ex. 4 at 18.) Once on the ground, the two tussled in a sort of bear hug for about two minutes. (Ex. 2 at 115.) During that time, Siegfried called for backup on his lapel radio. (*See id.* at 121.) It seemed to Porter that the officer blacked out for a moment and stopped to take a breather. (*Id.* at 124.) Porter's nephew observed Porter and Siegfried tussling on the ground for five or six minutes. (Ex. 4 at 19.) Siegfried testified that his weapon was in his unfastened holster when the Porter reached around his waist. (Ex. 7 at 30.) He testified that he felt Porter tugging on the weapon in the

holster. (*Id.* at 38.) Porter denied going for Siegfried's gun but testified that he might have grabbed Siegfried around his waist and torso. (Ex. 2 at 110, 113.)

As Porter and Siegfried struggled, Porter heard his nephew yelling, "that's my uncle," and "[s]top it" or "y'all stop it." (*Id.* at 115, 116.) He believes his nephew was yelling to both him and the officer. (*Id.* at 120.) Porter's nephew testified that he "told my uncle to stop. Stop moving, stop doing everything, and just try to let the situation calm down, simmer down." (Ex. 4 at 19.)

When Sergeant Delgado arrived at the scene, he did not know how the altercation started. (Ex. 3 at 12.) Radio dispatch had told him that somebody was fighting with an officer. (*Id.*) Porter's nephew said to him, "You don't need that taser. You can put that away. Everything is cool." (*Id.*) Porter recalls hearing his nephew say, "it's cool, don't worry about it." (Ex. 2 at 122.) Delgado found Siegfried and Porter wrestling around on the ground. They were both on their sides and seemed to be in an "equal scuffle." (Ex. 3 at 7.) Porter testified that he kept holding onto Siegfried "for dear life." (Ex. 2 at 119.) Porter's nephew observed Porter squirming while the officers tried to hold him down before he was tased. (Ex. 4 at 25.) Delgado testified that he told Porter to "put his hands behind his back or you're going to be tased;" Porter did not respond to this order. (Ex. 3 at 7.)

Delgado deployed the taser because he was concerned about getting on the ground to help the fight when another unrestrained subject was behind him. (*Id.* at 8.)

Porter first claimed that he was handcuffed before he was tased, then testified that he was not sure whether he was cuffed before the taser or not. (Ex. 2 at 131.) He believes one hand was handcuffed before the taser was deployed because his hands were cuffed when they picked him up. (*Id.*) Porter's nephew describes Porter's hands at the time he got tased as being out "like Jesus on the cross." (Ex. 4 at 25.) The video captured by Delgado's taser shows that Porter's arms were initially loose and in front of his body, then an officer deployed the taser and repeatedly ordered Porter to "put your hands behind your back," and then Porter was handcuffed while on the ground. (Pl. Ex. 1.)

Porter testified that other officers kneed him in the neck, kicked him in the ribs, thumbed him in the ear and punched him in the face. (Ex. 2 at 127-28.) Neither Porter nor his nephew can identify the officers who allegedly abused Porter in this manner. For his actions on August 11, 2015, Porter was later convicted of disorderly conduct. (Ex. 2 at 34.) He did not appeal his conviction. He had no medical bills arising out of this incident. (*Id.* at 138.) He did not go to a hospital; he healed himself after going to a clinic to check himself out. (*Id.* at 134-35.)

ANALYSIS

## City of Hammond Police Department

Defendants maintain that the City of Hammond Police Department should be dismissed because it is a non-existent entity that cannot be sued. Porter does not respond to this argument, and therefore waives any argument that his claims against the City of Hammond Police Department are valid. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in opposition to a motion for summary judgment are waived); *Laborers' Int'l Union of N. Am. v. Caruso,* 197 F.3d 1195, 1197 (7th Cir. 1999) (same). In Indiana, "[t]he 'department' of a city is merely a vehicle through which government fulfills its policy functions and is not a governmental entity unto itself." *City of Peru v. Lewis*, 950 N.E.2d 1, 4 (Ind. Ct. App. 2011) (citation omitted). Because "a non-existent entity cannot be sued," the City of Hammond Police Department is dismissed from the action. *Id*.

## Claims of Wrongful Arrest, Seizure, Lack of Probable Cause and Wrongful Prosecution

Defendants argue that summary judgment on Porter's claims of wrongful arrest, seizure, lack of probable cause, and wrongful prosecution is appropriate, in part because he was convicted in state criminal court of disorderly conduct. *See Mustafa v. City of Chicago,* 442 F.3d 544, 547 (7th Cir. 2006) (probable cause is

an absolute defense to § 1983 claims against officers for false arrest and false imprisonment); *Purvis v. Oest,* 614 F.3d 713, 723 (7th Cir. 2010) ("[T]he evidence required to establish probable cause is considerably less than that required to sustain a criminal conviction."). Porter advances no argument in support of these claims. When a plaintiff fails to defend a claim in response to a motion for summary judgment, the Court may deem the claim abandoned. *See Maclin v. SBC Ameritech,* 520 F.3d 781, 788 (7th Cir. 2008) ("In her response to [defendant's] motion for summary judgment, [plaintiff] failed to defend her claim against these arguments. She therefore abandoned the claim."); *Palmer v. Marion Cty.,* 327 F.3d 588, 597 (7th Cir. 2003) ("[B]ecause [plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned."). The Court treats Porter's failure to respond to Defendants' arguments as an abandonment of these claims, and grants summary judgment in Defendants' favor on these claims.

<u>Municipal Liability</u>

Defendants argue that Porter's 42 U.S.C. § 1983 claim fails because the City of Hammond has no policy or custom that enables officers to deprive citizens of their constitutional rights. Because Porter fails to address this issue in his memorandum in opposition, his argument on this issue is waived. *See Johnson,*

733 F.3d at 729 (holding that arguments not raised in opposition to a motion for summary judgment are waived); *Caruso*, 197 F.3d at 1197 (same). Even if Porter had not waived this argument, his position would fail. A municipality may only be held liable for constitutional violations caused by the municipality through its own policy, practice, or custom. *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978). A municipality cannot incur liability in an action under Section 1983 merely because it employs a tortfeasor. *Id*. at 691. To recover under *Monell*, a plaintiff must establish that (1) he suffered a deprivation of a federal right; (2) as a result of an express municipal policy, a widespread custom, or a deliberate act of a decision-maker with final policymaking authority for the municipality; which (3) was the proximate cause of his injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). Here, Porter has failed to proffer any evidence of an alleged policy, practice or custom causing his alleged unconstitutional deprivation. *See Cook v. Lain,* No. 2:10-CV-411-PRC, 2013 WL 866876, at *14 (N.D. Ind. Mar. 7, 2013) (granting summary judgment where plaintiff offered no evidence that defendant had an express policy, widespread practice or custom, or person with final policymaking authority that caused the alleged constitutional deprivation). As such, the Court grants summary judgment in favor of Defendant City of Hammond.

Defendants assert that, to the extent that Porter intended to sue Siegfried and Delgado in their official capacities, those claims fail. Porter failed to defend the official capacity claims in response to this argument, and therefore abandoned such claims. *See Maclin,* 520 F.3d at 788; *Palmer*, 327 F.3d at 597–98. Moreover, "[o]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L.Ed.2d 114 (1985) (internal citations and quotations omitted). To the extent Porter intended to assert claims against Siegfried and Delgado in their official capacities, such claims fail for the same reasons that his *Monell* claim against the City of Hammond fails.

Excessive Force Claims

Defendants also move for summary judgment on the excessive force claims against Siegfried and Delgado in their individual capacities.[1] "An officer who has the right to arrest an individual

---

[1] Individual capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky,* 473 U.S. at 165 (citation omitted). "[T]o be held individually liable, a defendant must be personally responsible for the deprivation of a constitutional right. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (citation

also has the right to use some degree of physical force or threat of force to effectuate the arrest." *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (citation omitted). "That right is circumscribed by the Fourth Amendment's reasonableness standard." *Id*. Factors relevant to the reasonableness inquiry include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989)). In determining whether an officer's actions were reasonable under the circumstances, courts should view the matter "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted). Courts remain cognizant of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Williams*, 809 F.3d at 944 (quoting *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013)). "[S]ummary judgment is often inappropriate in

---

and internal quotation marks omitted). The Complaint alleges that Siegfried and Delgado directly participated in the incident, and were "acting under the color of state law, were employees of and on duty" for the City of Hammond Police Department at the time of the incident. (DE #40-1, ¶15.)

excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (citation omitted).

Officer Siegfried

Defendants argue that the force used by Officer Siegfried was objectively reasonable and did not violate Porter's rights. Porter disagrees, citing *Morfin v. City of East Chicago,* 349 F.3d 989 (7th Cir. 2003). In that case, the plaintiff Morfin had allegedly interfered with law enforcement officers' investigation of voting machines. Morfin testified that the officers grabbed him, twisted his arm, shoved him toward the wall and took him to the floor. *Id*. at 1005. To this point, Morfin had not resisted any police action and informed the officers that he was going peacefully, so they did not need to handcuff him. *Id*. After the officers took Morfin to the floor, he crossed his arms on his chest to prevent the officers from handcuffing him. *Id*. The Seventh Circuit reversed summary judgment in favor of the officers on Morfin's excessive force claim, explaining that "[i]f a jury were to credit Mr. Morfin's version of events over that of the arresting officers, it could conclude that there was no reason for the officers to exert such force on Mr. Morfin." *Id*.

Here, the undisputed evidence shows that while Officer Siegfried was patting down Porter's nephew, Porter exited the

vehicle and repeatedly yelled at Siegfried. In his response brief, Porter claims that Siegfried rushed at him without giving any orders or commands. (DE #43 at 4.) The proffered evidence does not support this claim. Porter testified that Siegfried pointed to the vehicle and yelled something at Porter, and Porter's nephew testified that Siegfried told Porter to get back in the car. While Porter testified that he did not understand what Siegfried was saying, he conceded that Siegfried was probably telling him to stop interfering. The Court finds that there is no genuine issue of dispute regarding whether Siegfried gave orders to Porter, or whether Porter failed to follow those orders, before their physical altercation.

According to Defendants, Siegfried testified that Porter's refusal to get back in the car and his aggressive behavior forced Siegfried to abandon Porter's nephew, leaving him unrestrained and not yet checked for weapons, that that when Siegfried approached Porter, Porter lunged at him and took a swing. (DE #46 at 7.) The only proffered testimony from Siegfried mentions that Porter "charge[d] at" Siegfried. (Ex. 7 at 30.) Even if Defendants had proffered additional testimony from Siegfried about this issue, the Court must consider the evidence in the light most favorable to Porter, which is the testimony that Siegfried rushed at Porter, grabbed his neck and choked him. It is undisputed that the Siegfried and Porter fell to the ground and tussled in a bear hug.

As they tussled, Siegfried felt Porter tugging on his gun in his unfastened holster. While Porter denied going for Siegfried's gun, he testified that he might have grabbed Siegfried around his waist and torso. Siegfried called for backup, and they were still tussling on the ground when Sergeant Delgado arrived on the scene.

Under the first *Graham* factor, the initial infraction—Porter's yelling at Siegfried while he attempted to pat down Porter's nephew, who had been pulled over for a traffic violation—was not a significant violation. Under the second factor, Porter posed a threat to Officer Siegfried when he got out of the vehicle during the traffic stop and refused repeated orders to get back in the car, especially since Siegfried was a single officer without cover. *See Williams*, 809 F.3d at 944. The third *Graham* factor, whether Porter was actively resisting arrest, is more complicated. Relying on *Morfin*, Porter maintains that he did not begin to resist Siegfried until after he rushed Porter, grabbed his neck and choked him. He insists that after they fell to the ground, he was hanging onto Siegfried in a bear hug to prevent Siegfried from seriously injuring him. Defendants respond that even if Siegfried had put his hands on Porter's neck, his actions were not excessive because Porter does not claim that Siegfried touched his neck again, struck him or hurt him in any other way after they fell, but rather, that the two men struggled in a bear hug on the ground. In contrast to *Morfin*, Porter was not cooperative, failed to obey direct orders,

posed a safety threat to the single officer on the scene, and was not subdued by Siegfried.

Defendants cite *Williams v. Brooks*, in which the Seventh Circuit found that an officer used a reasonable amount of force where the plaintiff refused to get back into his car during a traffic stop, thereby creating a safety concern for the arresting officers. 809 F.3d at 944. The Court finds *Williams* to be distinguishable because the force used in that case differs from the force alleged here. In *Williams*, the officer's alleged force involved pushing the plaintiff against a car during his arrest. If a jury were to believe Porter, Siegfried rushed him, grabbed his neck and began to choke him. A dispute about how much force was used is material because it "bears directly on whether that force was a reasonable response to the situation faced by the officer." *Cyrus*, 624 F.3d at 862. The Court finds that the proffered testimony creates a material issue of fact as to the amount of force Siegfried used which cannot be resolved on summary judgment.

Officer Delgado

Defendants argue that the force used by Officer Delgado was objectively reasonable and did not violate Porter's rights. Porter alleges that Delgado's use of a taser on him while he was on the ground constituted excessive force. "Courts generally hold that the use of a taser against an actively resisting suspect either

does not violate clearly established law or is constitutionally reasonable." *Abbott*, 705 F.3d at 727 (citations omitted). They also "generally hold that it is unreasonable for officers to deploy a taser against a misdemeanant who is not actively resisting arrest." *Id*. at 730 (citations omitted).

It is undisputed that Sergeant Delgado responded to Officer Siegfried's call for backup, and arrived on the scene to find Porter's nephew unrestrained by the patrol car and Siegfried and Porter tussling on the ground. Delgado approached them, ordered Porter to put his hands behind his back, and when Porter failed to do so, Delgado deployed his taser. Delgado testified that he deployed the taser because he was concerned about getting on the ground to help the fight while another unrestrained subject was standing behind him. Porter claims that one wrist was handcuffed when he was tased, and his nephew testified that Porter's arms were out "like Jesus on the cross." (Ex. 4 at 25.) The video captured by Delgado's taser shows that Porter's arms were loose and in front of him before the taser was deployed, and that Porter was handcuffed behind his back after the taser was deployed. While the video does not clearly show whether Porter was partially handcuffed before being tased, there is no dispute that he was not fully handcuffed prior to being tased.

In considering excessive force claims, courts are to be cognizant that "police officers are often forced to make split-

second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Abbott*, 705 F.3d at 724 (quoting *Graham*, 490 U.S. at 397). An "officer's single use of a taser to subdue a suspect, who repeatedly had refused lawful orders of the police, was a reasonably proportionate response where failing to use the taser could have resulted in an escalation of violence." *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011) (citation omitted). Here, Delgado observed that Porter was resisting another officer and refusing lawful orders, and that another unrestrained subject was behind him. Given the "considerable leeway" courts are to afford "law enforcement officers' assessments about the appropriate use of force in dangerous situations," *Abbott*, 705 F.3d at 724-25, the Court finds that Delgado's single use of the taser to subdue Porter did not constitute excessive force.

### Qualified Immunity

Defendants also raise qualified immunity as a defense to Porter's excessive force claims. "Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (citation omitted). "Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (citations omitted). In determining

whether an official is entitled to qualified immunity, a court makes two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Burton v. Downey,* 805 F.3d 776, 784 (7th Cir. 2015) (citation omitted). "Although the privilege of qualified immunity is a defense, the plaintiff bears the burden of defeating it." *Betker v. Gomez,* 692 F.3d 854, 860 (7th Cir. 2012) (citation omitted). The Court has found the Sergeant Delgado's conduct did not constitute excessive force, and thus, Delgado is entitled to qualified immunity.

As for Officer Siegfried, the Court must determine whether the constitutional right at issue was clearly established. At the time of Porter's arrest, "it was of course clearly established that a police officer may not use excessive force in arresting an individual." *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 687 (7th Cir. 2007). For the purposes of the qualified immunity analysis, the Court assumes that Siegfried rushed at Porter and grabbed his neck before they fell and tussled in a bear hug on the ground. Because the force used by Siegfried was not "so plainly excessive that, as an objective matter, the police officers would have been on notice that [he was] violating the Fourth Amendment," Porter must identify a "closely analogous case that established a

right to be free from the type of force" used. *Findlay*, 722 F.3d at 899 (citations omitted). Porter has not carried this burden. While he relies on *Morfin*, the facts in that case are distinguishable. Unlike Morfin, Porter was not cooperative, failed to obey Siegfried's orders, posed a safety threat to the single officer on the scene, and was not subdued by Siegfried. "Given the short time frame, and the latitude that qualified immunity gives to officers to exercise judgment in tense and evolving situations, the Court cannot find that it was clearly established that this use of force was excessive under these circumstances, where [the plaintiff] was not yet handcuffed and had given no outward indication that he was not going to offer further resistance." *Jones v. City of Fort Wayne*, No. 1:15-CV-093 JD, 2017 WL 1059015, at *6 (N.D. Ind. Mar. 21, 2017). Therefore, the Court find that Officer Siegfried is entitled to qualified immunity.

CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment (DE #39) is **GRANTED.** The Clerk is **ORDERED** to **DISMISS** this case **WITH PREJUDICE** and to **CLOSE** this case.


**DATED: January 30, 2018**          /s/ RUDY LOZANO, Judge
                                     **United States District Court**